## THE SEABOARD NO. 25.

## SEABOARD SAND & GRAVEL CORPORATION v. ELMHURST CONTRACTING CO., Inc., et al.

### No. A–17013.

District Court, E. D. New York.

June 26, 1946.

Decree Affirmed Feb. 4, 1947.

Foley & Martin, of New York City (Christopher Heckman, of New York City, of counsel), for libelant and respondent impleaded.

Burlingham, Veeder, Clark & Hupper, of New York City (Charles E. Wythe, of New York City, of counsel), for respondent.

KENNEDY, District Judge.

Libelant, Seaboard Sand & Gravel Corporation (Seaboard), said originally that prior to October 26, 1943,[1] it chartered its deck scow Seaboard No. 25 "through Christie Scow Corporation" (Christie) to the respondent Elmhurst Contracting Co., Inc. (Elmhurst). The libel alleges that on December 1, 1943, the scow was returned in damaged condition, and that this was not the result of ordinary wear and tear. Elmhurst in its further answering clause (Article 13th) originally alleged that Seaboard No. 25 was damaged during the night of October 24, 1943, and in the early morning of October 25, 1943 because of a northeast wind which attained the "unpredicted velocity of hurricane force." The article alleges that respondent adopted proper and reasonable measures to protect Seaboard No. 25 but "due to the extreme ferocity of the storm" the scow parted her lines. By notice dated December 19, 1944, Elmhurst's proctors proposed an amendment to Article 13th to allege that the storm arose during the afternoon of October 25, 1943, and continued into the evening of October 26, 1943. The amended article also alleged that Seaboard No. 25 had pounded the pier and other craft. By notice dated January 24, 1945, a further amendment was proposed; the date of the storm was left at October 25, 1943, and during the day and evening of October 26, 1943, but it was alleged that the scow had "drifted ashore and grounded."

As originally drawn, the answer contained a counterclaim based upon an alleged agreement by the libelant, through Christie, to extend the insurance then carried on the scow, and a breach of this agreement by the libelant. At the trial it was stipulated[2] that a petition to implead Christie could be deemed filed, and that Christie appeared generally, and denied the allegations concerning the making of the contract to insure, or to continue insurance, and its breach.

During the course of the trial it began to be clear that Christie instead of being an agent was really a charterer and therefore should have been a respondent in the suit originally. A motion was made by libelant to correct the pleadings in this particular. Since Christie was already before the court I entertained the motion subject to such grounds of opposition as Elmhurst might urge in its brief.[3] For reasons which will be clearer at a later point I have granted this reserved motion, and in the discussion of the facts I shall treat Christie as if it were originally a respondent under its charter of Seaboard No. 25 from libelant, and subject to whatever claims Elmhurst had.

---

[1] By motion amended to "prior to" October 24, 1943 (s. m. 444).

[2] s. m. 16.

[3] s. m. 451–6.

Elmhurst was, in the fall of 1943, engaged in the construction of a pier for the Navy at Leonardo, New Jersey. This pier, which is shown on the chart in evidence,[4] extended generally in a northerly direction from the shore some 7,000 feet into Sandy Hook Bay. The material used in the construction of the pier was shipped by the Jersey Central to Atlantic Highlands. In that vicinity is another pier, also extending in a northerly direction into Sandy Hook Bay, called the Jersey Central pier. From this pier the material used in the new construction was lightered by barges, deck scows and catamarans over to the new pier. Elmhurst had a very large amount of floating equipment on the site: 12 deck scows, 7 derrick boats, 5 pile drivers, about 15 catamarans, and about 7 or 8 scows laden with consigned materials. Elmhurst also had in service a heavy-duty harbor tug (Henry Henjes), 4 light draft tugs (Westcoat, Hoosier State, Van and Rick), two passenger boats (Escort and Paramount), and a small launch.

Seaboard No. 25 is a steel deck scow 115 feet long and 32 feet wide. Elmhurst at that time had two other Seaboard scows in service (Seaboard No. 23 and Seaboard No. 57).

At the time Seaboard No. 23 and No. 57 were chartered Elmhurst's Vice President Mr. Hagen talked with Mr. Lynch, President of Christie. There is no doubt that there was some mention made in the conversation concerning what the insurable values of these scows were, and it is possible that Mr. Lynch gave it as his opinion that they were insured. Later when the chartering of Seaboard No. 25 was discussed it was Mr. Hagen's recollection that Mr. Lynch told him that insurance was unnecessary because there was an insurance policy already on the scow. But even assuming that a contract to procure insurance is maritime, I could not find as a fact that these conversations amounted to a contract on the part of Christie to insure the scows in behalf of Elmhurst.

On October 25, 1943, Elmhurst had received storm warnings and the weather had become so bad that the work of unloading and loading material had stopped. Conditions at the Jersey Central pier were very bad all during October 25, 1943, and October 26, 1943. The weather prediction was that the velocity of the wind was likely to reach 50 miles per hour on October 26, and a glance at the chart will show that the full force of a northeast wind would be directed against the outer face of the Jersey Central pier and the anchorage area to the east of the Leonardo pier. The trouble with the respondent's case is that none of its people had any exact information where Seaboard No. 25 was on the night of October 25, 1943, and all they seem to know with certainty, even now, is that the scow grounded near Leonardo. The respondent therefore presented its case on two different theories: (1) That Seaboard No. 25 was moored along the westerly side of Jersey Central pier on the night in question (October 26, 1943) and (2) that she was moored along the easterly side of Leonardo pier on that night.

Turning first to the incidents that occurred at the Jersey Central pier, a cement barge called the Popsie was moored along the face of that pier. As the wind and sea grew in force her lines began to snap. It was the theory of Elmhurst that Seaboard No. 25 was the outboard scow in a tier of three moored to the westerly side of the Jersey Central pier and quite close to the offshore corner. As Popsie swung around on her lines the evidence of Elmhurst shows that she swung into this tier of scows, and in some way they broke adrift. No tug was really available at the Jersey Central pier. The Henjes had broken down, and after some trouble Elmhurst secured another Moran tug (Agnes Moran), but she furnished no assistance, at least so far as libelant's scow is concerned. Such tugs as were available had evidently been sent to the Leonardo pier, where a large number of scows and pile drivers were also moored.

Elmhurst's alternative theory was that Seaboard No. 25 was made fast to some clusters on the westerly side of the Leonardo pier. On the evening of October 25th and all during the day of October 26th the

4 Respondent's Exhibit B.

mooring lines seemed to be proper, according to one of Elmhurst's witnesses. But on the morning of October 27, 1943 the scow tentatively identified as Seaboard No. 25 had parted some lines. There can be no question that Elmhurst's representatives were not sure that this scow, if it was Seaboard No. 25, was in a safe berth.[5]

Measures had been taken on the evening of October 26th, at about 5:00 P. M., to reinforce the lines of the scow at Leonardo pier. But these proved ineffectual, and ultimately the two forward outshore breast lines and spring lines all let go. The scow then swung around on her stern lines so that her bow fetched up against the loading platform. The record does not clearly reveal what happened to this scow thereafter, or whether she grounded.

■ On the issue of due care, Elmhurst's principal contention is that while it had had storm warnings it had no cause to anticipate a storm of such violence, and that if the piers to which the floating equipment was moored were exposed to storms, and remote from safe anchorage, the charterer has impliedly consented to these risks —that they would normally be incurred in operations in that locality. I am not persuaded by any of these arguments. The respondent Elmhurst had notice of severe weather to come, and I believe the precautions it took were inadequate. Since the respondent was in active charge of the operations in that locality, and was on notice of the conditions, as well as of the approaching storm, I believe it did not discharge its duty of due care, and that its negligence has been established by the entire record. I say this wholly independently of the fact that respondent was not even clear about the location of libelant's scow when the storm broke.

■ If Elmhurst is to escape liability on the theory of inevitable accident then surely it must establish by convincing proof that the disaster was brought about by causes beyond the control of anyone. This it has not done in this case.

■ It is true that libelant failed to keep a scowman on Seaboard No. 25, and that the terms of the charter require libelant to do this. But the proximate cause of the disaster, and the only proximate cause, was the negligence of respondent Elmhurst, and no one reading the whole record could suppose that the absence of a scowman had anything to do with the loss that occurred.

I have previously said that there was neither an express nor an implied agreement on the part of Christie to keep Seaboard No. 25 insured for respondent Elmhurst's benefit; even assuming that such a contract is maritime.

I ought again to make some mention about the condition of the pleadings. Respondent Elmhurst was never clearly apprized until the middle of the trial about the true relationship between libelant and Christie Scow Corporation. At first, both the pleadings and the statement of libelant's advocate indicated that Christie was merely an agent. Later it developed that Christie was actually an intermediate charterer. I felt at the trial, and still feel, that the two principal issues in the case were whether respondent Elmhurst was negligent, and whether there was an agreement between Elmhurst and Christie obligating the latter to keep the damaged scow insured for the benefit of the former. On the facts I have decided both these issues against respondent Elmhurst, and therefore I am unable to attach any great importance to the changes in the pleadings, and the confusion that resulted. However it does seem to me that it was perfectly possible for libelant to state its cause clearly from the beginning.

Libelant is entitled to a decree primarily against respondent Elmhurst Contracting Co., Inc. and secondarily against Christie Scow Corporation. I have filed findings of fact and conclusions of law.

---

5 Tajet, s. m. 553–4: "Well, it is hard to tell, for awhile you would think it would be, and sometimes you wouldn't."